```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY


TRISTAR PRODUCTS, INC.,          )  17-CV-1206
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
TELEBRANDS CORP., et al.,        )
                                 )
          Defendants.            )
-------------------------------- )
                                 )
TRISTAR PRODUCTS, INC.,          )  17-CV-1204
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
E. MISHAN & SONS, INC.,          )
                                 )
          Defendant.             )
-------------------------------- )
                                 )
TRISTAR PRODUCTS, INC.,          )  17-CV-5602
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
NOVEL BRANDS, INC.,              )  Camden, NJ
                                 )  September 12, 2017
          Defendant.             )  2:35 p.m.
```

                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOEL SCHNEIDER
               UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff :        EDWARD PAUL BAKOS, ESQUIRE
                           NOAM JOSEPH KRITZER, ESQUIRE
                           BAKOS & KRITZER
                           147 Columbia Turnpike
                           Florham Park, NJ 07932


For the Defendant         KATELYN O'REILLY, ESQUIRE
Telebrands:               WALSH PIZZI O'REILLY FALANGA, LLP
                          One Riverfront Plaza
                          1037 Raymond Boulevard, 6th Floor
                          Newark, NJ 07102

(Appearances continued)

```
                              TONIA A. SAYOUR, ESQUIRE
                              ROBERT J. MALDONADO, ESQUIRE
                              VISHAL PARIKH, ESQUIRE
                              COOPER & DUNHAM, LLP
                              30 Rockefeller Plaza
                              New York, NY 10112

For the Defendant            DENNIS FRANCIS GLEASON, ESQUIRE
E. Mishan and Sons:          JARDIM, MEISNER & SUSSNER, P.C.
                             30B Vreeland Road, Suite 201
                             Florham Park, NJ 07932


                             ANGELO NOTARO, ESQUIRE
                             JOHN ZACCARIA, ESQUIRE
                             NOTARO MICHALOS & ZACCARIA
                             100 Dutch Hill Road, Suite 240
                             Orangeburg, NJ 10962

For the Defendant            BRIAN O'REILLY, ESQUIRE
Novel Brands:                EPSTEIN DRANGEL, LLP
                             60 East 42nd Street, Suite 2520
                             New York, NY 10165


Audio Operator:              ECR


Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-0129
                             Office:  (856) 435-7172
                             Fax:     (856)  435-7124
                             Email:   dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                            I N D E X

2    MOTION TO STAY

3         Argument By:

4    Ms. Sayour                                    7, 49

5    Mr. Zaccaria                                  19, 51

6    Mr. O'Reilly                                     30

7    Mr. Kritzer                                      33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (The following was heard in open court at 2:35 p.m.)

2                THE COURT:  Everyone please be seated.  We're on the

3      record in three cases.  Tristar v. E. Mishan, 17-1204; Tristar

4      V. Telebrands, 17-1206; and Tristar v. Novel Brands, 17-5602.

5      These three cases have been consolidated for discovery and

6      case management purposes.

7                So let's start with the entries of appearance in

8      17-1204, the E. Mishan case, starting with plaintiffs.

9                MR. NOTARTO:  Angelo Notarto, Notaro Michalos &

10     Zaccaria.

11               MR. GLEASON:  And Dennis Gleason on behalf of E.

12     Mishan.

13               MR. ZACCARIA:  John Zaccaria from Notaro Michalos &

14     Zaccaria.

15               THE COURT:  So this is the 1204 case, right?

16               UNIDENTIFIED SPEAKER:  Yes, Judge.

17               THE COURT:  All right.  1206, Telebrands.

18               MS. O'REILLY:  Good afternoon, Your Honor.  Katelyn

19     O'Reilly from Walsh Pizzi O'Reilly Falanga on behalf of

20     Telebrands.  With me I have my co-counsel, Robert Maldonado,

21     and Toni Sayour, and Vishal Parikh from Cooper and Dunham.

22               THE COURT:  Welcome.

23               COUNSEL:  Good afternoon, Your Honor.

24               THE COURT:  And 5602, Novel Brands.

25               MR. O'REILLY:  Brian O'Reilly, Epstein Drangel for

1   Novel Brands, Your Honor.

2          THE COURT:  Counsel, I've read all the papers.  I

3   think I understand the arguments.  We'll hear all of your

4   arguments this afternoon.  The Court is going to reserve

5   decision.  I wanted to hear argument today and check up on a

6   couple of things, but you will get the Court's ruling

7   promptly.

8          Before we start, question about the Novel Brands

9   case.  Are you taking your position on this motion?

10          MR. O'REILLY:  We are, Your Honor.  We didn't put in

11   papers, just because we didn't want to contribute to the

12   Docket.  But we stand with the other defendants now that it's

13   consolidated.  We figured as one goes, they all go.

14          THE COURT:  Okay.  You might want to send me a

15   letter to that effect in the future.

16          MR. O'REILLY:  We will, Your Honor.  Yes, I know.

17          THE COURT:  Because there's nothing on the record

18   that shows that you joined --

19          MR. O'REILLY:  We'll put it in by the end of the

20   day, Your Honor -- actually by the end of tomorrow, if that's

21   okay.

22          THE COURT:  Okay.  Well we have a transcript now.

23          MR. O'REILLY:  Okay.

24          THE COURT:  All right.  The first motion was filed

25   in the Telebrands case, so I think we ought to hear from them

1    first.  And, Telebrands, it's your motion, so I'll hear from

2    you.  But if you'll indulge me, I just have a question to

3    start.

4           It's unclear to me if you're requesting a stay of

5    the entire case, or if you're requesting a stay of just the

6    patent portion of the case.

7           MS. O'REILLY:  Your Honor, we are requesting a stay

8    of the entire case.  Both the patent claims and the trade

9    dress claims.

10          THE COURT:  Is that the same for E. Mishan as well?

11          MR. ZACCARIA:  Yes, it is, Your Honor.

12          THE COURT:  And is that the same for Novel Brands as

13    well?

14          MR. O'REILLY:  Yes, Your Honor.

15          MS. O'REILLY:  Your Honor, we have a presentation,

16    if I may approach and hand it up?

17          THE COURT:  Can you indulge me with another

18    question?

19          MS. O'REILLY:  Sure.

20          THE COURT:  Is the Court's understanding, correct,

21    that there are two other similar cases pending in New Jersey?

22          MS. O'REILLY:  That is my understanding, Your Honor.

23    I believe there are two other cases pending in Newark.

24          THE COURT:  Right.

25          MS. O'REILLY:  Yes.

1          THE COURT:  Is anybody doing anything about trying

2     to consolidate all those cases?

3          MS. O'REILLY:  On behalf of Telebrands, I do not

4     know.  No one has approached us with respect to that, so I'm

5     not sure.  I don't know that there's anything on the Docket.

6          THE COURT:  How about Tristar?

7          MR. BAKOS:  Your Honor, Edward Bakos of Bakos &

8     Kritzer for Tristar Products.  We have not made any effort.

9     Those cases are moving along up there.  The defendants have

10    not requested a consolidation of those cases.

11         There are other cases pending within the U.S. as

12    well.

13         THE COURT:  So, counsel, what do we say when Tristar

14    stands up and says, Judge, why should you stay these three

15    cases when there's two almost identical cases up in Newark

16    that are going to proceed?

17         MS. O'REILLY:  Your Honor, they didn't argue that

18    here.  So if they were going to argue that, I'd be surprised

19    to hear that today.  But if they do say that, I'm not sure

20    that they have the exact same patents that we do, so I'm not

21    -- I'm not certain that it would be exactly the same.

22         MS. SAYOUR:  Good afternoon, Your Honor.  Tonia

23    Sayour with Cooper & Dunham for the defendants.  And

24    defendants respectfully request that you grant the motion to

25    stay pending reexamination, particularly where the Patent

1   Office has decided that there are substantial questions of

2   patent validity in light of almost all the prior art that was

3   cited by Telebrands, from all foreign design patents in this

4   lawsuit.

5           THE COURT:  I keep on thinking of questions I want

6   to ask you.  One more.

7           MS. SAYOUR:  Sure.  Of course.

8           THE COURT:  I just wanted to make sure my

9   understanding is correct.

10          MS. SAYOUR:  Sure.

11          THE COURT:  In your case, 1206, there are four

12  design patents that are asserted, is that right?

13          MS. SAYOUR:  Correct.

14          THE COURT:  And is it correct that ex parte

15  reexamination, that request was granted as to all four

16  patents?

17          MS. SAYOUR:  Correct.  And, actually, that leads me

18  into the next slide.  It's Slide 2.  Just to give the Court a

19  quick overview of the facts and the different patents that are

20  at issue in our case, as we said, there are four design

21  patents at issue.

22          Three of those patents are directed to a pan.

23  There's the 664 patent, which is the broadest patent.  It's

24  the square pan, it disclaims the handles.  There's the 103

25  patent, which is also the square pan like the 664, but it adds

1    an induction plate on the bottom of the pan.  And then there

2    is the 641 patent, which is also the same square shape as the

3    664 patent, but includes the handles, the induction plate, and

4    also the color.

5           If we turn to slide 3, please.  The last patent

6    that's asserted against the defendants is a patent directed to

7    a fry basket.  That's the 352 patent.  The next slide.  This

8    slide has a relevant time line as it relates to the filing of

9    this action and the requests for reexamination filed by

10   Telebrands.

11          Tristar commenced this action on February 21st of

12   2017, and just ten days later Telebrands filed the first

13   reexamination request for the broad patent, the 664 patent,

14   the broader of all the patents.

15          THE COURT:  Are you showing us this chronology to

16   support your contention that there was no dilatory motive on

17   your client's part?

18          MS. SAYOUR:  You read my mind, Your Honor.  That's

19   exactly why.  There has been an allegation that we were very

20   dilatory, and I think this shows that we moved rather

21   promptly.  So we filed the first request ten days after the

22   complaint was filed, and then the other two reexamination

23   requests were filed two months after that.

24          And then the last one on the fry basket was filed

25   one month after they amended the complaint to add it an issue

1   in this lawsuit.   The Patent Office granted the first

2   reexamination request on May 24th, 2017.   And then Telebrands

3   filed this action one month later.   And after the filing of

4   the action, the Patent Office order the other three

5   reexaminations in August.

6           And that summarizes this slide.   Can we turn to

7   slide 5, please?   So as the reason why we're here on what we

8   have now is that the Patent Office has ordered reexamination

9   in all four patents in suit, and I'll admit that the animation

10  is -- is a little bit dramatic.   But it is an important fact

11  here, Your Honor.

12          On the next slide for the 664 patent, the Patent

13  Office determines that there's a substantial new question of

14  patentability in view of all ten references that Telebrands

15  had cited.   And on the next slide, we have all ten of those

16  references next to some figures of the 664 patent.

17          On slide 6, the 103 patent.   The Patent Office

18  determined that there's a substantial new question of

19  patentability as to all 13 references that Telebrands cited.

20  And if we turn to the next slide, same as before, all 13 of

21  those references are shown there, next to some of the figures

22  of the 103 patent.

23          Next slide, please.   Same thing with the 641 patent,

24  they found that there's a substantial new question of

25  patentability in view of all 13 references cited by Telebrands

1    in the 641 patent.  And the next slide also has those figures

2    there as well.

3          And the next slide is the fry basket.  The Patent

4    Office didn't agree with all of Telebrands's art there.  They

5    found that it was -- there's a substantial new question of

6    patentability for two of the five references we cited.  But

7    they are depicted on the next slide.  And sometimes a picture

8    is worth a thousand words, and the fry basket seems somewhat

9    identical to the patent suit there.

10          So that brings us to the legal issues in this motion

11   and -- and as the Court is aware, there are three factors that

12   are considered in deciding whether to grant a motion to stay

13   pending reexam.  Your Honor referred to them as the <u>Xerox</u>

14   factors in the <u>Brass</u> case.  And they are whether a stay would

15   unduly prejudice or present a clear tactical disadvantage to

16   the non-moving party.

17          Whether the stay would simplify the issues, and the

18   stage of the litigation.  And all those factors weigh in favor

19   of granting a stay.  So if we look -- we're going to work a

20   little backwards.  If we look at the third factor, the stage

21   of the litigation, this factor's easy, because the plaintiffs

22   concede that litigation is in its early stages.

23          The second amended complaint was filed less than

24   four months ago.  There's been no discovery, no scheduling

25   order.  And I believe that this factor's very important here

1   because a vast majority of the cases that were cited by the

2   plaintiffs in their briefing, those cases were much further

3   along where they denied the motion to stay, those cases are

4   much further along.

5          This factor has actually been characterized as "one

6   of the most critical factors in determining whether to stay

7   litigation pending the outcome of a reexamination proceeding."

8   That's the Sybert v. Waddington case, 2007 Westlaw 20 --

9   excuse me -- 2705157 at 7.  It's a District of New Jersey case

10  September 7, 2007.

11         So this factor we believe leans heavily in favor of

12  granting the stay.  If we turn to the next slide.  With

13  respect to the second factor, the simplification of the

14  issues.  There are many advantages that -- of a reexamination

15  that are considered by Court's.  That this Court is also

16  aware, they are laid out in the Eberle  case.

17         Rather than read them all, they're all there, and

18  we'll go into a few shortly.  But this case could benefit from

19  these advantages.  If you'd turn to the next slide, please?

20  If the Patent Office finds that any or all of these patents

21  are invalid, and we think it is likely that they're going to

22  do so, the issues for trial would be greatly narrowed, if not

23  eliminated all together, and that would necessarily alleviate

24  discovery problems.

25         And it could eliminate the need to make infringement

1   determinations.  And for discovery, elimination of the patent

2   issues would take one of the parties out of the case, that's

3   the Chinese entity Ke M.o. House, and it would help in terms

4   of discovery of one of the Chinese inventors as well.

5            We don't think the plaintiffs can seriously contest

6   that there would not be a reduction of costs if the case were

7   stayed for the parties and the Court, along with the

8   conservation of judicial resources.  Depending on the outcome

9   of the case, there could be an encouragement to settle.  So we

10  think that the second Xerox factor supports granting a stay as

11  well.

12           And the first factor, which will be the last factor

13  that we'll discuss, which is the prejudice to the plaintiffs,

14  we turn to slide 18, please.  The cases have recognized,

15  because the possibility of delay is present in every case

16  where a stay is sought to allow the Patent Office to reexamine

17  a patent, then delay alone is an insufficient basis to deny

18  the stay.

19           And the Court would actually look to something else

20  to show prejudice, and in this case while we don't deny that

21  we're competitors, the inquiry doesn't end there.  We're not

22  talking about a drug product, where you often have two players

23  in the market, the generic and the brand name.

24           We're talking about cookware.  And in particular

25  we're talking about square pans.  And this market is not a two

Sayour - Argument                                    14

1    player market, and plaintiffs don't make that claim.   There

2    are many other sellers of cookware and square pans.   Some are

3    named defendants in other lawsuits.   And some supply the prior

4    art.

5           So there is case law that says there is less of a

6    risk of undue prejudice when there are a number of active

7    companies in the relevant market.   That's the <u>Neste Oil v.</u>

8    <u>Dynamic Fuels</u> case.   It's a 2013 Westlaw 424754 at 3 it's a

9    District of Delaware case.

10          Now in the event that the Court were to determine

11   otherwise, which we would dispute, the Court should still

12   grant the motion to stay, because in the <u>Thermolife</u> case, and

13   I apologize I don't the citation on me right now, but it's in

14   our briefing.   Oh, no, it's actually in Tristar's briefing, it

15   was cited by Tristar.

16          There are other -- the other factors, the

17   simplification of the issues, and the stage of the litigation

18   weighed in favor of granting the stay there.   Now this case

19   involves a little bit of a unique situation in that the

20   plaintiffs moved for preliminary injunction against us.   But

21   they voluntarily withdrew it after the Court denied the

22   preliminary injunction in the Emson litigation.

23          This isn't a situation where they didn't file a

24   motion -- they did file it, it's somewhat worse, and

25   voluntarily withdrew it after the Court issued a decision

1   saying that their irreparable harm claims, among other things,

2   were unsupported by any evidence.  And it's the same thing for

3   this motion, they're relying on the same thing.

4        And it's particularly problematic here, where this

5   Court has required tangible evidence of how Telebrands's

6   actions have affected it in the market.  And that's the Smart

7   Vent case.  So -- and in the unlikely event these patents do

8   survive reexamination, we would submit, Your Honor, that a key

9   issue in this case, which distinguishes from some of the cases

10  cited by plaintiffs, is that monetary relief would compensate

11  them for their purported losses.

12       The Court in Emson, in denying the preliminary

13  injunction, also found that to the extent any statements

14  support a finding of price erosion or lost sales, the money

15  damages could be available to compensate them for any harm.

16  And that is certainly the case today.  So in short, there's no

17  undue prejudice to plaintiffs in granting the motion for a

18  stay.

19       THE COURT:  Tell me why the whole case should be

20  stayed, instead of just staying the patent portion of the

21  case?

22       MS. SAYOUR:  So we recognize, Your Honor, that there

23  are trade dress claims as well.  And we think that the Court

24  could benefit from the Patent Office's findings in that

25  regard.  If the Patent Office rejects the design of

Sayour - Argument                                    16

1    plaintiff's square pan and finds that it's obvious in my prior

2    art, for example, then we think that plaintiffs will have a

3    hard time proving that their -- their trade dress is

4    distinctive, and that they have exclusive use to that design,

5    because there would be others in the market.

6         We also -- we also think that they've admitted in

7    their briefing that discovery will overlap with discovery for

8    the patent claims.  So if that's the case, then they are

9    intertwined, at least according to -- to plaintiffs.  It's on

10   page four of their brief, Docket Number 47.

11        And I also want to --

12        THE COURT:  But I remember reading, I'm not sure

13   which defendant's brief it was, that said the exact opposite.

14   Was that your brief?

15        MS. SAYOUR:  I think it may have been our reply

16   brief.

17        THE COURT:  Okay.  On page 12?

18        MS. SAYOUR:  Yes, I believe it was.  And I -- I do

19   note that there are differences between the two claims.  But

20   if they're admitting that those claims are the same, at least

21   for these purposes, then I think that that cuts -- that cuts

22   against them --

23        THE COURT:  So they're admitting there's an overlap,

24   you wrote that --

25        MS. SAYOUR:  Discovery.

1          THE COURT:  -- discovery is different.  But I should

2     believe them instead of you?

3          MS. SAYOUR:  Well I think there is a slight -- well,

4     no.

5          THE COURT:  Do you want to take back what you wrote

6     in the brief?

7          MS. SAYOUR:  I think we were probably a little

8     over-zealous, if you ask me, when rereading that.  But --

9          THE COURT:  But you've got to be careful, sometimes

10    judges read the briefs.

11         MS. SAYOUR:  I do want to make a -- make a note of

12    one thing, and it may border also on the -- on the undue

13    prejudice as well.  Plaintiffs claim, I think in the

14    preliminary injunction briefing, that they were selling this

15    product, I believe it was 2016, and that Telebrands came to

16    the market in about March of 2016.  And certainly if they

17    believed they were being harmed by the trade dress, they could

18    have -- could have brought a preliminary injunction, could

19    have sued over a year ago.

20         And they didn't do that.  Instead, they waited for

21    those design patents to come in.  And that, to us, is an

22    admission that they're tied together, at least in their eyes.

23         THE COURT:  Well can we bring it down to a real

24    practical level?  In terms of, say, discovery, can you talk

25    about whether in fact there will be an overlap in the

1  discovery needed to prove the trade dress claim and the patent

2  claim?

3            I understand the elements are different.  But, for

4  example, are the same people going to be deposed?  Are the

5  same documents going to be requested?  Is the same ESI going

6  to be searched for and produced?

7            On a real practical level, can you tell me about

8  that?

9            MS. SAYOUR:  Sure.  Yes.  Absolutely, Your Honor.

10 And I do think there is an overlap, and I would say that it's

11 in the context of functionality.  I think there are elements

12 of these design patents that we would view to be functional

13 and not part of the design.  When we talk about trade dress,

14 functionality is a key issue there, because in order to have a

15 protectable trade dress, they have to prove it is

16 non-functional.

17            So I do foresee a lot of overlap in -- in getting

18 down to the bottom of what it is that's functional versus

19 nonfunctional.

20            THE COURT:  Okay.  Anything else?

21            MS. SAYOUR:  I think that's all for now.

22            THE COURT:  Okay.  It's your motion, you'll have the

23 last word.

24            MS. SAYOUR:  Thank you, Your Honor.

25            THE COURT:  I do think it makes sense to hear from

1   the other moving parties before we hear from plaintiff.  So

2   why don't we hear from them.  And that's the 1204 case.

3            So let me just make sure I have this right, counsel.

4   In your case, six patents are asserted, is that right?

5            MR. ZACCARIA:  That's right, Your Honor.

6            THE COURT:  And in your case, three of the six

7   patents are subject -- presently subject to reexamination?

8            MR. ZACCARIA:  That's correct, Your Honor.

9            THE COURT:  Three of six?

10           MR. ZACCARIA:  Yes.  Those patents are the 103

11   patent, the 664 patent, and the 352 patent.

12           THE COURT:  And what's your response if plaintiff

13   stands up and says, Judge, it doesn't make sense to stay these

14   cases, because the same exact discovery is going to go on in

15   two cases up in Newark?

16           MR. ZACCARIA:  Your Honor, those are different

17   products, different defendants, not related at all to the

18   defense and the products that are at issue in this case.  The

19   issues are different, the discovery is probably going to be

20   different in terms of the origination of the defendant's

21   products.

22           So I think the --

23           THE COURT:  Are they different patents, do you know?

24           MR. ZACCARIA:  I don't know off the top of my head.

25   I believe there's at least one overlap of the patents, Your

1    Honor.   And as counsel pointed out, that was not a point that

2    was raised by Tristar in its opposition papers.

3             Your Honor, I want to touch on, just real quickly,

4    since it's fresh, the issue about the trade dress claims and

5    other discovery that could be implicated -- overlapping

6    discovery.   First, with respect to trade dress claims, the

7    trade dress claims, Your Honor, are really red herrings in

8    this case.

9             The crux of this case concerns design patents for

10   pans.   That's the crux of this case.   The trade dress claims

11   are really an afterthought.   And, Judge --

12            THE COURT:   Can I say that in my opinion?   That's

13   your view, right?

14            MR. ZACCARIA:   That's right, Your Honor.

15            THE COURT:   What do you think plaintiffs are going

16   to say in response to that argument?   Do you think it's --

17   isn't it likely they're going to disagree with that?

18            MR. ZACCARIA:   I think, Your Honor, if I could

19   continue, Judge Bumb in her opinion noted, in her opinion

20   denying the motion for preliminary injunction, that there was

21   no evidence of actual confusion.   There was no evidence of

22   secondary meaning that was established at the time that Emson

23   first introduced the product.

24            So I think there -- it's going to be a tough case to

25   show a likelihood of confusion.   But, nonetheless, Your Honor,

1    in terms of the overlap discovery, the overlap discovery, the

2    same products are at issue, Emson's products are at issue with

3    the design patents, are also at issue with respect to the

4    trade dress claims.

5           Plaintiff is asserting trade dress for product trade

6    dress and packaging trade dress.  So the overlapping discovery

7    includes sales information leading to those products, it could

8    include third-party discovery, where third-party products or

9    third-party patents relevant to a potential prior art position

10   could also be relevant as to whether or not that prior art

11   existed at the time that plaintiffs claim that they were

12   establishing their trade dress.

13          So that can include taking foreign discovery,

14   discovery of the manufacturers and suppliers of these

15   third-party pans that were noted in Emson's opposition to the

16   motion for preliminary injunction.  So there's certainly a

17   vast overlap in discovery.  And it's our position that it

18   would be inefficient to go ahead with the trade dress claims

19   while the patent claims are -- are stayed.

20          And the same witnesses that will be testifying as

21   regarding the origination of the Emson products, the

22   development of the Emson products, are going to be testify --

23   that testimony's going to be relevant to both the patent

24   claims and the trade dress claims.

25          So just as Your Honor knows, the patent

1    reexaminations are administrative proceedings that have been

2    implemented for a just, efficient resolution of patent and

3    validity issues.  And the Patent Office has been basically

4    ordered by statute to conduct these reexaminations by special

5    dispatch.  They proceed, not in the ordinary course of a

6    normal examination where you file a patent application and it

7    goes through its normal process of examination.

8          In contrast, a reexamination concerns -- it is a

9    process where the examiner -- and it's a different examiner,

10   Your Honor, which is important.  It's not the same examiner

11   that studied the patent -- first -- the application the first

12   time around.  It's a different examiner.

13         So that different examiner has to examine the -- the

14   claims and issue an office action.  The applicant, or the

15   plaintiff in this case, must respond to that office action

16   within two months, which is different from the ordinary course

17   if this was a normal examination.  So, in other words, what

18   I'm trying to say, Your Honor, this is a proceeding that's

19   going to proceed with special dispatch, which the Patent

20   Office is obligated to do.

21         I think the third point is really the point -- the

22   third point regarding the status of the litigations I think is

23   the -- I think it to be undisputed that certainly these cases

24   are in their very early stages.  There's been some written

25   discovery that's been exchanged between the parties, but

1    there's been no noticed depositions.  There's been no

2    depositions taken.  There's been no expert discovery.

3              There's been nothing with respect to claim

4    construction.  In fact, the plaintiff just recently filed an

5    amended complaint -- fourth amended complaint, Your Honor.

6    Four amended complaints they recently -- they issued, which

7    basically I think basically is going to reset the scheduling

8    in the Emson matter.

9              So, you know, there's been no dispositve motions

10   filed, obviously.  So I think the -- and the fact that the

11   cases have been consolidated for discovery and case management

12   purposes, I think also weighs in favor of staying these cases.

13   Because, if not, then you could have the risk of inconsistent

14   rulings in these different cases, if one -- for example, if

15   one case is stayed against a particular defendant and not the

16   other defendant.

17             So that third factor weighs in favor of the stay.

18   The second factor, in terms of simplifying the issues, we

19   acknowledge there are going to be issues after their

20   examination, you have trade dress claims.  Three of the

21   patents which are being asserted against Emson are not the

22   subject of reexamination.  But those facts alone, Your Honor,

23   are not the basis for denying the grant of stay.  These issues

24   are going to be simplified.

25             If a claim -- if one of the patents get knocked out,

1    or few patents get knocked out, that's going to certainly

2    resolve discovery issues.  There'd be less discovery on those

3    claims, obviously.  There will be no claim construction issues

4    relating to their patent if it gets knocked out.  We won't

5    have to -- there will be no expert discovery relating to those

6    patents get knocked out.

7            And even assuming, Your Honor, that none of the

8    claims and none of the patents do get -- are certified

9    invalid, this Court has acknowledged the benefit of -- of

10   these reexamination proceedings.  The examiners when they look

11   at these -- these reexaminations, they're going to study the

12   claims.

13           They're going to study the prior art.  And the

14   examiner is not going to limit him or herself to only the

15   prior art that Telebrands proposed, they're going to do their

16   own search.  So they may find other prior art that they may

17   feel is more important, more significant, and base an office

18   action on that additional prior art.

19           So -- and we don't know at this point.  There's been

20   no office action issued to date in -- in either of those

21   reexaminations.  So there could be additional prior art that

22   could be relevant in the Patent Office's mind.  But the

23   examiner will do their own search.  They'll issue an office

24   action, and there will be -- and then the -- Tristar will have

25   two months to respond to an office action.

1        Tristar could make statements during the prosecution

2   which could be very relevant to the claim construction.  They

3   could take a position which may narrow the scope of the

4   claims, which would be very helpful to the Court in its claim

5   construction proceeding, once the cases are restarted.  So

6   there's -- there's certain benefits, regardless of whether

7   their -- the claim -- patents are deemed invalid or not, that

8   certain benefits in staying the case in the event they're not

9   deemed invalid.

10        In addition, there are -- there were two patents

11   that Tristar recently asserted against Emson, the 908 patent

12   and the 909 patent.  Those are the patents that are the

13   subject of the fourth amended complaint.  Those two patents

14   are a continuation -- continuations of the Rometh Reed patent,

15   which is the subject of a reexamination.

16        In the Emson's reply on page four, Your Honor -- I'm

17   sorry, page seven, Your Honor, and on page eight.  We -- we

18   showed side-by-side the figures of -- figure 7 of 108 -- of

19   103 with the 908 patent and the 909 patent.  Each one of those

20   three patents potentially disclose the same subject matter.

21   The difference with the 909, Your Honor, is that it discloses

22   the induction plate, and it discloses a center around the --

23   in the center of the induction plate.  But it shows the pan

24   body and the handles in dash line.

25        But it's -- everything else in terms of the

1    induction plate is the same as in the 103 patent.  With

2    respect to the 908 patent, the 908 patent discloses the pan

3    body, and it discloses the induction plate.  But it shows --

4    it discloses the center of that induction plate in dash line.

5           So what does that mean?  Well I think we'll find out

6    once the reexamination -- the reexamination of the 103 patent

7    may lead to some evidence in terms of what exactly does that

8    mean.  And I think that would help in claim construing the 908

9    patent.

10          What I'm trying to say, Your Honor, these -- these

11   disclosures are very -- essentially identical, and any prior

12   art that's going to be applicable for the 103 patent likely

13   also will be application to the -- the analysis of the 908

14   patent and to the 909 patent for validity purposes.

15          And, again, I think it's important to point out that

16   these -- these patents were asserted after we filed the motion

17   to stay.  They weren't filed before.  And I think they're

18   really filed really to create -- to try to fabricate some

19   issues in connection with this motion to stay.

20          I think with respect to the first factor, the undue

21   prejudice factor is probably the one that's most controversial

22   between the parties.  And there, I think counsel, I think

23   appropriately described the reasons as to why there is no

24   undue prejudice.  I think -- we acknowledge that the products

25   are competing products.  We're not disputing that.  But there

1    are third-party suppliers of the same square pan patents, and,

2    for example, we even included samples of that in the Exhibit C

3    to my declaration.  Other square pans that are being supplied,

4    or sold on the marketplace.

5                THE COURT:  Is there some advantage to a square pan

6    as opposed to a round pan?

7                MR. ZACCARIA:  Your Honor, there could be an

8    advantage, if you want to create a square casserole.  I

9    suppose you can't create a square casserole in a round pan.

10               THE COURT:  You're talking to someone who doesn't

11   cook at all.

12               MR. ZACCARIA:  Yeah.

13               THE COURT:  I just wonder why these are so popular.

14               MR. ZACCARIA:  Your Honor, there could be some

15   functional aspects to that, so --

16               THE COURT:  That's beyond your -- that's not part of

17   your patent case.

18               MR. ZACCARIA:  -- I'm not going to lie to you there.

19               THE COURT:  Someone I know in here has the answer to

20   that.  There must be some advantage, because so many people

21   are selling square pans now.

22               MR. ZACCARIA:  Well those square pans, Your Honor,

23   were sold prior to the Tristar square pan.  And those square

24   -- examples of those square pans were cited in Emson's

25   opposition to the motion for preliminary injunction.  One

1   included the Wool, W-O-O-L, pan.  There was a -- they

2   submitted a -- they catalog a Freiling catalog which disclosed

3   another square pan.  So there were other square pans in the

4   marketplace prior the Tristar square pan.

5            THE COURT:  But now when you go to Walgreens they

6   have a whole section of square pans.  Different companies.

7            MR. ZACCARIA:  And no one -- and there's been no

8   evidence of record that anyone's been confused with those

9   square pans being sold, Your Honor.  Which goes to the trade

10  dress issue.

11           But going back to the undue prejudice factor.  So --

12  so we have third -- other third parties selling square pans,

13  as shown on the record.  You know, in terms of these

14  conclusory allegations about price erosion, and loss of market

15  share, and having to decrease prices, there's no evidence that

16  there's been an altered market share whatsoever.

17           And Judge Bumb noted that in her decision, in her

18  opinion.  And there's been no evidence submitted in response

19  to the motion to stay of any loss of market share, or any

20  price erosion.  And Court's -- this Court has held those types

21  of damages can be -- can be compensated by -- by monetary

22  damages, by monetary compensation.

23           And that should not be the reason to deny a motion

24  to stay.  I'm just flipping around, Your Honor, because I

25  don't want to repeat the arguments that were previously made,

1    Your Honor.

2         (Pause)

3         MR. ZACCARIA:  Your Honor, I don't think any -- it

4    may not have been -- may have been noted, but the normal

5    pendency of an examination is typically around 20 months, or

6    24 months.

7         THE COURT:  Does that include the appeal to the

8    Federal Circuit?

9         MR. ZACCARIA:  The appeal to the Federal Circuit is

10   different, Your Honor.  The appeal to the Federal Circuit can

11   typically take anywhere between two to three years.  It's

12   important to note, Your Honor, that in a reexamination, Your

13   Honor I'm sure knows this, it's only the patent owner that can

14   appeal.

15        Once the requestor submits their request for

16   reexamination, they're basically out of the picture.  So now

17   it's really the only -- it's the only -- it's the only thing -

18   - it's the interplay between the examiner and the patent

19   applicant.  If the patent applicant gets a -- a certification

20   of invalidity, then certainly that could be appealed.

21        If there's a certification of validity, that

22   decision cannot be appealed.

23        THE COURT:  We've seen a lot of appeals in this

24   courthouse.  It doesn't happen in two weeks, or two months, it

25   takes a while.

1        MR. ZACCARIA:   Now those are all my points, unless

2   Your Honor has any additional questions.

3        MR. ZACCARIA:   Thank you, Judge.

4        THE COURT:   Thank you.   Novel Brands, do you have

5   anything to add?

6        MR. O'REILLY:   I do have something that I want to

7   address, the question that you raised, because I believe we

8   have the perspective on the -- but I'll wait until the --

9        THE COURT:   Are you going to -- you're going to tell

10  us why a square pan is more advantageous over a round pan?

11       MR. O'REILLY:   I can give you that a whirl, Your

12  Honor.   I can assure you I'll be wrong, but I would say

13  addressing that, that no matter the issue of the popularity of

14  the pan, the question here is the validity of the patent.

15       And even if the appeal has some first move or

16  advantage to the plaintiff, the question becomes, is the

17  patent valid?   And that's the base of the complaint -- of the

18  dispute, and should be the focus of the motion to stay.   But

19  that's not what I wanted to say.

20       What I wanted to say is, Your Honor asked

21  repeatedly, why or how should the other cases that were filed

22  play into this motion to stay?   And I think that, in my kind

23  of lowbrow view of how you look at a motion to stay, you say,

24  what do we conserve for resources, versus fairness to the

25  plaintiff.

1          You know, they get their day in Court.  Here, the

2     plaintiff chose to file these cases in different ways, in

3     different places, not as related cases.  So they can't claim

4     it's unfair to them to have another case going on in Newark,

5     and have it stayed here, when they're the ones that chose to

6     file in that manner.  And I think our case exemplifies that.

7          Because our case was filed in Rhode Island.  Neither

8     the plaintiff nor Novel have any connection to Rhode Island.

9     Hence, why it was transferred here.  Now I cannot come up with

10    a reason why it was filed there, other than they had some

11    attorneys that work there.  That was the reason they gave.

12    Obviously there are attorneys here as well.

13         But I think it shows a propensity to try to increase

14    the cost on the defendants.  We're a small company.  We --

15    litigating this case throughout would be very costly for us,

16    more so than any damages would be.

17         So filing in Rhode Island, and not allowing us to

18    join other people practical -- it in all practical terms takes

19    us out of the game.  But we're here now, and we're joined in

20    this motion to stay.  And, hopefully, if it's not stayed,

21    we'll join the discovery, hopefully within our cost.

22         But I think the point is, is that the plaintiff

23    should not be rewarded for filing cases in multiple

24    jurisdictions, or in the same jurisdictions not filing them as

25    related cases, which I still don't understand how it was done,

1        that shouldn't be rewarded by denying the motion to stay here.

2                Because the motion to stay here will most certainly

3        conserve resources.  And the fairness element is taken off the

4        table by their own actions.  And that would be my answer to

5        your question, Your Honor.

6                MS. SAYOUR:  Your Honor, may I address your question

7        about the square pan?  Just because I am a baker.  And

8        everybody looked at me when it happened.  But I did remember

9        that when we were -- when we were opposing the motion for

10       preliminary injunction, I watched a few infomercial's, and it

11       was about plaintiff's square pan.

12               And in the words of their own advertising:

13                "With the square pan, you have more surface, you

14       can fit more product into the pan."

15               And:

16                "In a square pan you get a little pour spout built

17       right in."

18               And that was when they were talking about the

19       rounded edges.  And then they talked about, there's more:

20               "And remember my square shape is working for me

21       here, Denise."

22               Denise says:

23                "Yes, it is.

24                "Because, look, I can get all these pork chops in,

25       because I have four corners.  Right?"

1          "Right."

2          "When you have a round pan you can't do that."

3          Denise:

4          "That's right.  It's not that big, I get it.  So

5    Copper Chef's unique square shape means it can cook more food,

6    you can't get this -- you can't make this in a round pan."

7          So that's -- thank you, Your Honor.

8          THE COURT:  Thank you.

9          MS. O'REILLY:  Thank you.

10          THE COURT:  Plaintiff, I'm sure you are anxious to

11    argue.

12          MR. KRITZER:  Good afternoon, Your Honor.  Noam

13    Kritzer on behalf of Tristar Products.

14          THE COURT:  Just indulge me with a question or two,

15    counsel.

16          MR. KRITZER:  Certainly.

17          THE COURT:  Do these motions rise or fall together,

18    in your view?

19          MR. KRITZER:  No, Your Honor.

20          THE COURT:  So in your view, theoretically,

21    hypothetically it could be possible, we stay one case, and two

22    cases proceed, vice versa, you know, you could have any

23    combination of the three cases, that's your view?

24          MR. KRITZER:  I don't think it's any combination, I

25    think that the 1204 case, Your Honor, involves a different set

1    of patents, that even if the reexam's are wholly successful,

2    will still need to be tried.  And since Rule -- the breadth of

3    Rule 26 would cover the discovery over all the copper pan, it

4    makes less sense to stay the 1204 case, then, say, the 1206

5    case, which all of the patents that are in that case are being

6    reexamined.

7            THE COURT:  Is that because the 009, 908 and 909

8    patents are not subject to reexamination?  Is that why you're

9    saying that?

10           MR. KRITZER:  Correct, Your Honor.  In addition, the

11   908 and 909 patents, prior to issuance the patent examiner

12   considered all of the references submitted by Telebrands, as

13   well as all of the papers in all of the cases, we submitted

14   the complaints, we submitted the preliminary injunction

15   motions, we submitted everything for our consideration.  And

16   on the front of the 908 and 909 patents, you can see that the

17   examiner considered them prior to issuing the 908 and 909

18   patents.

19           So I think that it's -- it's less -- less efficient,

20   because even if the examiner finds that the other four

21   patents, the 664, 103, 641 and 352 patents are valid, we still

22   have the validity of these patents that will have to be tried.

23           THE COURT:  But that happens all the time, doesn't

24   it?  You can have a -- aren't there legions of cases where a

25   stay is granted with the Court knowing that some portion of

1    the case is going to come back to it in the future.

2                MR. KRITZER:  Of course.

3                THE COURT:  So in and of itself that's not enough to

4    deny a stay.

5                MR. KRITZER:  No, Your Honor.  But I believe the

6    question was whether or not they all had to be stayed

7    together, and that would be one reason, in the Court's

8    discretion to find that -- that the 1204 case should not be

9    stayed.

10               THE COURT:  You heard their argument about -- the

11   direct competitor argument, that was a big part of your

12   response and brief.  What say you?

13               MR. KRITZER:  Well I don't understand the argument

14   so much.  They rely on the two-party competitor system.  Which

15   I understand if it's two-party competitor and you have one

16   competitor in Court, you have basically the rest of the market

17   in the courtroom, and that factor, simply having multiple

18   competitors in the marketplace doesn't change the analysis if

19   you have all the other competitors in the courtroom as well.

20               It might as well be a two -- a two-party marketplace

21   with the plaintiff and all the defendants at being two-party.

22   So the analysis I guess probably went over my head.

23               THE COURT:  Well I thought part of your argument was

24   that, take Telebrands for example, that because their product

25   is on the market your client has suffered a substan -- a loss.

Kritzer - Argument                          36

1    And their position is, if they're not buying Telebrands,

2    they're buying something else, not necessarily your product.

3          MR. KRITZER:  Right.  And our response to that would

4    be, they're buying one of the other infringing products that

5    we have the defendant in Court either here, or in Newark, or

6    there's a case or two in Rhode Island as well.  So the

7    argument fails when you consider all the defendants as a

8    whole.

9          And I think that, you know, Your Honor said it

10   pretty plainly before, if all of these square pans have been

11   ubiquitous as all defendants are now claiming, why is it that

12   all of a sudden, after Tristar patents and introduces the

13   square pan, you go to Walgreens, you go to Bed Bath and

14   Beyond, you go to, you know, some of the other -- Walmart, and

15   you see shelves of these, and they're identical to one

16   another.

17         So I think that whichever one they buy, they would

18   have bought only the Tristar product, because that's, you

19   know, patents convey the limited monopoly.  But just because

20   they're not buying the Telebrands one and they're buying the

21   E. Mishan one, doesn't mean that Tristar's not being harmed.

22   Tristar's still being harmed, it's being harmed by one of the

23   defendants in the courtroom.  Either this courtroom or another

24   courtroom.

25         THE COURT:  That's one part of their argument.  But

1   another part of their argument is that, you know, your brief

2   can argue and state in general conclusory terms that we're

3   losing business because of their products, and, yada, yada,

4   yada, yada, but where's the proof?

5           You know, that's another part of their argument.

6   And they rely on the statements that Judge Bumb made at the

7   preliminary injunction.  And as I understand it, please

8   correct me if I'm wrong, you haven't submitted any new

9   evidence to prove that these defendants are -- are resulting

10  in a loss of business to you, other than what you submitted at

11  the preliminary injunction hearing.

12          MR. KRITZER:  That's correct, Your Honor.  I would

13  submit --

14          THE COURT:  So why -- why are you -- same evidence

15  that Judge Bumb found not convincing, now convincing before

16  this Court?

17          MR. KRITZER:  Well there's two parts, Your Honor.

18  First -- the first part is that the standards are different

19  upon review of a motion for summary -- for a preliminary

20  injunction, and the standard on whether or not to grant the

21  stay.  And I think that that's important, because the grant of

22  preliminary injunction is an extraordinary remedy.

23          THE COURT:  Well tell me what evidence you have

24  submitted to support the contention that you're losing

25  business because of these competitors' products?

1          MR. KRITZER:  We only have declarations and

2   commonsense, Your Honor.  That's all.  And that was submitted

3   earlier.  And, again, Tristar has, you know, over a half a

4   dozen patents covering this product.  It didn't exist before

5   Tristar put it on the shelves, and now there are shelves full

6   of competing products.

7          It's not unreasonable to -- to suggest that for

8   every product purchased that is not a Tristar product, that

9   Tristar's losing market share.  The issue you have with

10  proving that at this stage, is that it's a complex analysis,

11  and we would have to undertake the discovery.

12         We don't know how many products are sold to E.

13  Mishan.  We don't know how many products are being sold by

14  Telebrands.  It's a complex analysis.  I believe the

15  declaration of Eddie Mishan himself indicated that it's -- you

16  know, this kind of analysis is very complex and very difficult

17  to undertake.

18         Once we have the discovery, we'll be happy to engage

19  an expert to submit a declaration at the appropriate time.

20  But at this point, it's -- it's a very difficult and very

21  complex analysis.  So --

22         THE COURT:  So am I hearing then that a tacit

23  acknowledgment that no substantial proof has been submitted

24  that your client is suffering a monetary loss, loss in sales

25  because of the defendants' product?

1           MR. KRITZER:  Nothing more than was submitted to --

2    in connection with the complaint and the motion for

3    preliminary injunction.  But I don't think the inquiry ends

4    there.  Really, the inquiry comes down to, and I apologize I

5    don't have fancy slides, but slide 16 of Telebrands's

6    presentation, Your Honor, this is the crux, and the attorneys

7    for E. Mishan said the same thing, the crux of this is --

8    actually, Novel Brands said it as well, so all three, the crux

9    is the balancing, and the Court's discretion on the balancing

10   of -- of whether or not it -- what resources would be

11   conserved, and the inconvenience of plaintiff.

12           The inconvenience to the plaintiff everybody agrees

13   on, is not overwhelming to the point where it decides the --

14   the outcome.  And we are forced to concede that as well, Your

15   Honor, as you just pointed out.

16           However, we have to look at what resources would be

17   conserved if there is a stay.  And everybody seems to -- on

18   defendants' side seems to assume the conclusion that these

19   patents will be invalidated.  And that's the only -- if you

20   look at the header on pages 16 and 17, "if the patents in suit

21   are invalidated, the case will be simplified."

22           Of course that's a very reasonable position and it's

23   tough to argue against, Your Honor.  The -- the problem is, is

24   if they're not invalidated, the case isn't simplified at all,

25   it's just delayed, and unnecessarily so.  Because, again, the

1    breadth of Rule 26 discovery on the trade dress claims, and I

2    think you heard it straight from defendants' mouths, overlaps

3    significantly with the discovery that would be required for

4    the patent infringement causes of action as well.

5            THE COURT:  You're not suggesting the Court doesn't

6    have the authority to also stay the trade dress claim, are

7    you?

8            MR. KRITZER:  Not at all, Your Honor.  All I'm

9    saying is, if the trade dress claims are stayed, and the

10   patents in suit are invalidated, then we would have to resume

11   with the trade dress claims at the conclusion of the

12   reexamination.

13           So all you're doing with the trade dress claims is

14   delaying them, which is well within the Court's discretion.

15   But if the discovery on the patent claims will overlap with

16   the discovery from the trade dress claims -- and the trade

17   dress discovery will have to happen anyway, there's no

18   conservation of resources by staying the case, there's just

19   delay.

20           In addition, as Your Honor pointed out, there's two

21   other cases in Newark that are pending.  And as the attorney

22   for Novel Brands pointed out, there's other cases in Rhode

23   Island that are pending.  The attorney for Novel Brands is

24   very passionate about not understanding why they're not

25   related cases.  I can tell you that, from my perspective, the

1      cases were filed as related cases, the District Court of New

2      Jersey splits them up, I guess, however they see fit.

3            But if --I don't believe that any of the defendants

4      in either of those four other cases have requested a stay.

5      They've -- their answers have been filed in the Newark cases.

6            THE COURT:  Is it the same patents at issue?

7            MR. KRITZER:  Over -- yes.  In -- I don't believe

8      any of them overlap entirely.  They're, you know, a subset of

9      the overall patents here.  It is present in each of those

10     cases.

11           THE COURT:  Do we know if they know about the

12     ongoing reexamination?

13           MR. KRITZER:  I believe at least one of the

14     defendants is aware of it.  I don't know about the remaining.

15           THE COURT:  Is that something you have -- not you,

16     your client has a duty to disclose?

17           MR. KRITZER:  If it does have a duty to disclose,

18     then it will disclose them either as part of the initial

19     discovery, or the discovery requests, whenever --

20           THE COURT:  Do you have a duty to disclose?

21           MR. KRITZER:  I don't know -- I honestly don't know

22     the answer to that, Your Honor.  But we would disclose it, we

23     have nothing to hide.  So we would disclose it upon first

24     opportunity.  There's no reason not to.  And like I said, we

25     -- we know for sure --

1          THE COURT:  Did you have your Rule 16's in those two

2     New Jersey cases?

3          MR. KRITZER:  Yes, Your Honor.

4          THE COURT:  Was it disclosed at the Rule 16

5     conference?

6          MR. KRITZER:  At one of them it was discussed at the

7     Rule 16.  At the other, I don't believe it came up, and I

8     don't know if it -- at this point I don't know whether the

9     Rule 16 happened prior to the date of the motion.

10          So the analysis that we need to be considering here

11     is whether or not the -- there's efficiency in staying the

12     case, because if there is judicial efficiency, if there is

13     significant conservation of resources, then it makes sense to

14     stay the case.

15          And if it -- if there isn't, then it doesn't make

16     sense to stay the case.  I think that's the -- the task that

17     is upon the District Court in determining whether or not to

18     exercise its discretion in executing a stay.

19          Again, with respect to the 1204 case, the -- there

20     is not a full overlap of the patents that are in

21     reexamination.  And I don't believe that there's any

22     inefficiency in taking the discovery with respect to all of

23     the patents in suit.

24          Because the two patents that will be remaining, even

25     if all four reexaminations are successful, the discovery's

1    nearly, if not fully identical.  The product in question will

2    be identical, the deponents will be identical, the testimony

3    will be nearly identical, if not identical.

4             So from a conservation of defendants' resources, I

5    don't see any benefit to -- to a stay.  With respect to the --

6    all of the patents in suit, all the cases before the Court,

7    you have the trade dress issues, which, again, will have to be

8    adjudicated following the reexamination.

9             And there's a different standard in determining

10   whether or not there's trade dress infringement.  And they

11   mentioned there -- one of the attorneys mentioned that they

12   didn't see any confusion.  We actually have instances of

13   actual confusion, at least one I'm aware of, Your Honor.

14            I don't know why that needs to be tried today, or

15   discussed today.  But I felt the need to say it, because they

16   did.  But there's a different standard for trade dress

17   infringement then there is for patent infringement, and the

18   standard for a trade dress infringement I think is a little

19   broader, because you're not narrowed to the specific design of

20   a design patent.  Coupled with the breadth of Rule 26, again,

21   discovery on the trade dress claims would fully encompass the

22   discovery required for the patent claims, with one exception.

23            And that is, if the patent claims fail, if the

24   patent claims end up out of the case, then no discovery would

25   be needed from the Chinese defendant, the co-inventor of the

1   patent, Ke M.o.

2              We also think it's important and I -- I briefly

3   glossed over it earlier in response to one of your questions,

4   but we think it's very important to note that the patent -- a

5   patent examiner at the Patent and Trademark Office has already

6   considered all the arguments made in the preliminary

7   injunction, and all of the arguments made as part of the --

8   the reexaminations, and has issued the last -- the most recent

9   two patents.

10             One thing that occurs to us, Your Honor, is that --

11  and Mr. Zaccaria mentioned this as well, there's a preclusive

12  binding effect on Tristar in the reexamination, there's no

13  conclusive or binding effect on any of the defendants here.  I

14  think that weighs slightly against granting a stay as well.

15  Because if the patents are successful, and upheld on

16  reexamination, we're going to be back in front of this Court

17  trying invalidity a second time.

18             So they'll get a second bite at the apple.  I think

19  that our case for a stay would be weaker, if the defendants

20  agreed to be bound by the result of the reexamination.  If

21  defendants agreed that they wouldn't challenge validity if the

22  Patent Office found the reexamination.  Obviously, it's a

23  tougher ask from the defendant that did submit the

24  reexamination.  However, as per Telebrands in the 1206 case,

25  they compiled all the prior art they knew of.

1           They submitted it to the Patent Office.  If the

2    Patent Office decides that it's upheld, we don't want to be

3    back here fighting, you know, invalidity from them again,

4    they've already had their bite.

5           THE COURT:  Do you think there's any chance they'll

6    agree to that binding effect?

7           MR. KRITZER:  I think if Your Honor said that Mr.

8    Kritzer made sense, and that if I -- if you are not going to

9    bind yourself, then I will not grant the stay, there's a

10   chance, Your Honor.

11          THE COURT:  Has that ever happened in any of your

12   cases?

13          MR. KRITZER:  Yes, Your Honor.  And it's actually

14   happened in a Telebrands case.  A case between Tristar and

15   Telebrands where Judge Donio lifted a stay, because the

16   defendant would not agree to be bound by an administrative

17   procedure.

18          THE COURT:  Another patent case?

19          MR. KRITZER:  Correct.

20          THE COURT:  That --

21          MR. KRITZER:  Yes.  You know those expandable and

22   contractible hoses?  You can talk to Judge Donio about it.

23          THE COURT:  That's yours?  That's yours, too?

24          MR. KRITZER:  That's Telebrands and Tristar.  Well

25   you saw from the PowerPoint --

1             THE COURT:  Is that the one they tell you never

2    breaks, but I need to -- is that your client's?

3             MR. KRITZER:  That's not the Tristar hose, Your

4    Honor.  I won't -- I won't tell you whose hose it is.

5             THE COURT:  Do you know how many of those hoses I've

6    bought?

7             MR. KRITZER:  Well depending on which color it is, I

8    can tell you which -- if it's the light green one, it's

9    Telebrands, if it's the blue one, it's Mr. Mishan's, if

10   it's --

11            THE COURT:  The one that sells at Bed Bath and

12   Beyond, is that the green one?

13            MR. KRITZER:  The light green one would be

14   Telebrands, I believe.

15            THE COURT:  Well, never mind, let's not go there.

16   But --

17            MR. KRITZER:  I'm not saying anything about their

18   product, I'm just answering your question, Your Honor.

19            THE COURT:  But, boy, that -- they broke every

20   single time I used them.

21            Anyway, let's talk about pans.

22            MR. KRITZER:  And now that we have a little break,

23   I'll also add my two cents on the pan.  My chili's never

24   tasted better, Your Honor.

25            THE COURT:  And I don't eat pork chops, so I'm not

1    worried.

2              MR. KRITZER:  You know, and another reason the cases

3    don't rise and fall together, Mr. Zaccaria was clear that, you

4    know, each of the cases is different products, and different

5    defendants, and different -- so there's no reason to hold one

6    to the same standard as the other when considering a motion to

7    stay, particularly because of the difference in the overlap in

8    the patents.

9              If he wants to bring up the -- the difference in the

10   products as well, you know, we'll take it.  And my numbers

11   were a little different than Mr. Zaccaria's numbers.  Our

12   average time to end of reexamination, not including appeal,

13   was 39 months.

14             And we think that that's a little too long.  And

15   we're not going to quibble about it, 24 months is too long

16   too.  Particular --

17             THE COURT:  It takes a long time.

18             MR. KRITZER:  -- it takes a long time.  And the --

19   the balancing is, is whether or not in each of the particular

20   cases with the different factors, that I'm not going to repeat

21   again, discovery, et cetera, that 24 months is too much in

22   this case, because at the end of that 24 months, even if the

23   reexaminations are successful, there's going to be a ton of

24   work to do on the remaining patents and claims, and those

25   overlap.

1          I can't think, other than, again, other than

2     plaintiff Ke M.o., I can't think of any resources, Court's or

3     otherwise, that would be wasted by allowing these cases to go

4     forward.  With the caveat that we're -- we're now talking

5     about the non-Telebrands cases, right?  Oh, no, we're talking

6     about them all.  Sorry.

7          THE COURT:  I'm sorry?

8          MR. KRITZER:  No, I'll -- let me repeat.  I can't

9     think, other than the involvement and deposition of the

10    Chinese entity, Ke M.o. who is the co-inventor on the patents,

11    I can't think of any discovery that will not be necessary,

12    even if all four reexaminations are successful.

13         THE COURT:  Because of the trade dress claim.

14         MR. KRITZER:  Correct.  And the fact that Rule --

15    the Rule 26, the discovery requests will cover the same

16    documents, people, information, in both.  So if we're taking

17    the balancing test over the 24 or 39 months, depending on who

18    you want to believe, versus that one Chinese entity's

19    testimony, documents, subscription, then I think that that

20    weighs against the stay.

21         And in the event that we want to deal with that, I

22    think we can come up with a clever way of dealing with that,

23    postponing their testimony until 24 months.  I know there was

24    complaint about, well, the expert reports, et cetera.  You

25    know, we'll get there.  If we need to postpone later, we can

1   do that.  But at this point, you know, discovery is going to

2   have to be conducted that way.  Thank you, Your Honor.

3           THE COURT:  Thank you, counsel.

4           MR. KRITZER:  Unless you have any questions.

5           THE COURT:  Counsel, you have the last word, and

6   this is where you stand up and say, I'll be brief.

7           MS. SAYOUR:  I will be very brief, Your Honor.

8   First thing, I know my partner reminded me that I should have

9   told you the docket number from the script that I read into

10  the record.  It was Docket Number 17 in our case, on page 17.

11  So if you need that, it's there.

12          Your Honor, Tristar is -- is trying to claim

13  exclusive rights to a square pan.  They cannot.  It's nothing

14  new.

15          THE COURT:  But I'm not here to -- we're not here to

16  judge the merits of the case.

17          MS. SAYOUR:  No, no, I understand that.  And I guess

18  where I'm going is, they argue that we're going to get two

19  bites at the apple.  But that assumes that there's going to be

20  an apple left at the end of the reexamination.

21          This Court has already determined in connection with

22  the denial of the preliminary injunction in the Emson

23  litigation, that two of these patents are likely to be

24  invalid.  And when we look --

25          THE COURT:  You know what, counsel, I think I can

1  sometimes read your mind, but I can't read the Patent and

2  Trademark Office's mind.  I don't know how they're going to

3  rule.  And I don't really think I can base my decision on

4  whether I think they're going to rule one way or the other.

5         You think you're going to win, plaintiff thinks

6  they're going to win, and I don't think that's a relevant

7  consideration to the motion to stay.

8         MS. SAYOUR:  No, that's fair, Your Honor.  I guess

9  that's why we're all -- we're all here.  I guess what I do

10  want to address is their argument on the simplification of the

11  issues.  I just -- your decision in the Brass case made note

12  of whether or not reexamination has the potential to eliminate

13  an issue altogether and reduce the costs associated with

14  litigating it.

15        And you also noted that if the PTO opposed the

16  validity of plaintiff's patents, the plaintiff's rights will

17  only be strengthened, as the challenger's burden of proof

18  becomes more difficult to sustain.

19        And I think that's the issue here.  I mean, if the

20  patents go away, then the issues will be simplified.  And if

21  they don't, then we have a -- they have a stronger patent.

22  You know, disappointing to us, but that would be it.  There

23  was some argument about all the competitors that are here --

24  or all the -- I don't know that I followed it 100 percent, but

25  that are here, or what's in the market.

1           And that's just not true.  I think in Zaccaria's

2    declaration Exhibit C there are a whole bunch of other people

3    selling square pans that I don't believe are here.  And

4    certainly people may buy a pan from Telebrands -- people may

5    not buy a pan from Telebrands, may not buy a pan from Emson,

6    may not buy a pan from Tristar, any of the others, but there

7    are other pans out there.

8           That's all I have.

9           THE COURT:  Thank you.

10          MS. SAYOUR:  Thank you, Your Honor.

11          MR. ZACCARIA:  I'll be brief Your Honor.

12          THE COURT:  You can stay there, counsel.

13          MR. ZACCARIA:  Okay.  Great.  Just two points -- I

14   think three points.  First point, Mr. Kritzer refers to the

15   submission of prior art in connection with the 908 and 909

16   patent, and that the examiner considered the prior art.

17          That's not true, Your Honor.  The fact that you

18   submit prior art doesn't necessarily mean that the examiner's

19   looking at every single page, hundreds of pages of prior art

20   that was submitted.

21          That prior art was not considered, they simply

22   provided it to the Patent Office, which it got rubber stamped,

23   and now it's on the front page of the patent.  But it wasn't

24   considered.  That's number one, Your Honor.

25          Number two, in terms of reserving resources, expert

1    discovery is a big resource that would be conserved by staying

2    the case.  We're going to have expert discovery on four -- on

3    at least three patents, the 103 patent, the 664 patent, and

4    the 352 patent.

5            That is -- the last I checked, expert discovery

6    would be quite costly, and that's certainly something that

7    would be -- would be beneficial to -- to postpone.  Also claim

8    construction.  What happens if the Emson case is not stayed,

9    but the Telebrands case is stayed?

10           The Patent Office determines that the claims, the

11   patents are invalid, but this Judge, this Court determines

12   that the claims are not -- patents are not invalid and they're

13   infringed.  Who's prejudiced there, Your Honor?  Emson is.  So

14   it doesn't make sense to stay one case and not to stay the --

15   they all have to be stayed.

16           That's it, Your Honor.  Thank you.

17           THE COURT:  Thank you.  Okay, counsel, the record is

18   closed.  And as I've told you, the Court reserve decision.  I

19   wanted to check on a couple of things, hear the argument

20   today.  But you will get the Court's decision promptly.  I

21   just want to add one more thing for the benefit of the

22   lawyers.

23           The Court appreciates the excellent briefs and oral

24   argument this afternoon.  Here we have my old law clerk, who's

25   leaving in a few days to get a real job as a lawyer instead of

1    a law clerk, and a new law clerk who's just starting.  And

2    there sure are some excellent lawyers arguing some very

3    difficult issues, and I'm glad they were here to see the

4    caliber of lawyer in this courtroom.

5              So, thank you all, we're adjourned.  And you'll get

6    the Court's decision promptly.

7              ALL COUNSEL:  Thank you, Your Honor.

8              THE CLERK:  All rise.

9         (Proceedings concluded at 4:14 p.m.)

10                         * * * * *

11                    C E R T I F I C A T I O N

12   I, Josette Jones, court approved transcriber, certify that the

13   foregoing is a correct transcript from the official digital

14   audio recording of the proceedings in the above-entitled

15   matter.

16

17   ----------------------------          -------------------

18   JOSETTE JONES                          DATE

19   DIANA DOMAN TRANSCRIBING, LLC